IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

BETTY POWELL                                                                              PLAINTIFF

VS.                                                     CIVIL ACTION NO.  2:04CV290KS-MTP

DEANNA K. STEWART, M.D.
and DONALD G. TOWNSEND, M.D.                               DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

      This cause is before the court on defendants' motion for summary judgment.  From its review of all matters made a part of the record of this case as well as applicable law, and being thus fully advised in the premises, the court FINDS that the motion should be granted in part and denied in part.  The court specifically finds as follows:

FACTUAL BACKGROUND

      On September 9, 2002, plaintiff Betty Powell was admitted by her regular physician, Dr. Ronald A. Bullock, to Forrest General Hospital in Hattiesburg, Mississippi because Ms. Powell had lost fifteen pounds over the previous few weeks and was experiencing recurrent diarrhea, weakness, fatigue and a possible seizure with slurred speech at times.  At the time of this hospitalization, Ms. Powell was supposed to be taking the medication Amaryl, an oral blood glucose lowering drug, for her diabetes but had not been taking it for some time because of her poor appetite and weight loss.  In the course of the hospitalization, a consultation was requested of Dr. Andrew Lin, an infectious disease specialist, who noted that Ms. Powell had been diagnosed with diabetes for five years and was on diet control.

1

During the course of the hospitalization, CT imaging revealed that there was a cyst in the right lower quadrant of Ms. Powell's pelvis, as well as a cyst in her liver. Defendant Dr. Deanna Stewart, an Obstetrician-Gynecologist, was consulted as a result of finding the pelvic cyst. Ms. Powell was discharged from the hospital on September 14, 2002.

Ms. Powell was subsequently seen by Dr. Stewart at her clinic. Dr. Stewart suggested undergoing an exploratory laparotomy so that the pelvic cyst could be diagnosed. Dr. Stewart also explained to Ms. Powell because of her history of multiple surgeries and adhesions, she would be at an increased risk for bowel injury (compared to the average patient); that there were other risks associated with surgery such as infection, bleeding, damage to internal organs (including the bowels, bladder, rectum and ureters); that if bowel injury was recognized at the time of surgery it would be repaired at that time, but if not recognized until a later date, it may require additional surgeries; and that if Dr. Stewart observed problems with the bowel during the surgery she would have Dr. Ralph Abraham, a general surgeon, present if needed.

On October 2, 2002, Ms. Powell was admitted to Forrest General Hospital for the exploratory laparotomy. Dr. Stewart, assisted by Dr. Libby Kot, performed the surgery and "shelled out" the pelvic cyst without difficulty. There were some adhesions to the bowel which were "freed up."

The following day, on October 3, 2002, nursing assessment revealed Ms. Powell's wound dressing to be clean and dry, her abdomen to be soft and not distended, and although there were hyperactive bowel sounds, there was no diarrhea or constipation. Dr. Stewart also noted on that day that Ms. Powell had good oral intake and that her abdomen was soft and non-distended with hyperactive bowel sounds noted. On October 4, 2002, Ms. Powell was seen by defendant Dr.

Robert Townsend who noted that she did not then have a fever but she had had a temperature of 101.7 degrees earlier that morning. Dr. Townsend noted that Ms. Powell had no flatus. Dr. Townsend ordered an increase in Ms. Powell's diet to full fluids, ambulation in the hallway four times a day, and 500 milligrams of Augmentin, an antibiotic, to be given orally three times a day. That same day, nursing assessment revealed the dressing to be clean, dry and intact with no drainage.

The next day, on October 5, 2002, Dr. Townsend noted that Ms. Powell's temperature was 99.1 degrees and that the incision was dry with a small amount of subcutaneous fluid collection on the right side of the incision. Subsequent nursing assessment on that date revealed no significant change in status other than that bowel sounds were hypoactive. On October 6, 2002, Dr. Townsend visited Ms. Powell again. He noted that her temperature was 100.3 degrees, that she was not moving well and that she had not had a bowel movement. Dr. Townsend ordered that the Augmentin be discontinued and that Ms. Powell be given 80 milligrams of Gentamycin intravenously every eight hours, and 1.5 grams of Unasyn intravenously every twelve hours.[1]

The following day, on October 7, 2002, Ms. Powell was seen by Dr. Lamar Glaze, who noted that Ms. Powell's temperature was 98.8 degrees, that she had complained of nausea the previous evening, and that Ms. Powell's abdomen was soft and tender but with good bowel sounds and positive flatus.

On October 8, 2002, Ms. Powell was seen again by Dr. Stewart. Dr. Stewart's assessment revealed that there was an area of necrosis along the right superior margin of the

---

[1] These are both more powerful antibiotics than Augmentin.

incision. Dr. Stewart opened the wound and 20 cc's of foul smelling bloody fluid drained out. The wound was then irrigated and debrided with hydrogen peroxide and a portion of the fluid was sent for culture and sensitivity. Ms. Powell was then taken to surgery at which time Dr. Rick Pecunia, a plastic surgeon and Dr. Abraham, assisted by Dr. Stewart, identified a bowel leak at the lower end of the incision with areas of the bowel covered with pus.

Ms. Powell was subsequently returned to surgery on two or more occasions for extensive debridement of necrotic tissue secondary to necrotizing fasciitis and for subsequent skin grafting. Ms. Powell was finally discharged from the hospital on November 22, 2002.

Ms. Powell commenced the instant lawsuit on August 30, 2004. The complaint alleges that defendants were negligent by failing to timely discover and adequately treat her post-operative infection, and by failing to adequately and properly assess and manage her diabetes. The complaint alleges that as a result of this alleged negligence, plaintiff sustained serious injuries and complications for which she was required to undergo additional and extensive diagnostic testing, surgical procedures and other medical care for which she incurred great expenses and for which she will continue to incur expenses in the future. Plaintiff seeks damages for these expenses, as well as for pain and suffering, loss of vitality and disfigurement.

Plaintiff designated Dr. Gerard DiLeo, a board-certified obstetrician/gynecologist, as her sole expert. Dr. DiLeo produced a report dated August 18, 2004 and was deposed by defendants on July 7, 2006. The deadline for the designation of experts by the plaintiff was June 1, 2006 and the discovery deadline was August 1, 2006. The case is currently set for trial on December 4, 2006. Defendants moved for summary judgment on August 3, 2006 and requested oral

argument on their motion. Plaintiff opposes the motion.[2]

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the non-movant may not rest on the pleadings, but must "identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case."  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "The moving party need not support its motion with affidavits or

---

[2] The court notes that plaintiff's response to the motion for summary judgment was untimely.  On October 12, 2006, after the time for response had long since passed, this court entered an order that plaintiff show cause within ten days why defendants' motion should not be considered by the court without response.  On October 18, 2006, without responding to the order to show cause and without no explanation for the untimeliness of its response, Plaintiff submitted a memorandum in opposition to the motion.  Plaintiff's memorandum was considered by the court in deciding the motion for summary judgment.

other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995) (citation omitted).

In analyzing a motion for summary judgment, all evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Palmer v. BRG, Inc.*, 498 U.S. 46, 49 n.5 (1990) (*quoting Anderson*, 477 U.S. at 255). Nevertheless, "conclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass*, 79 F.3d at 1429 (citation omitted). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "In such situations, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

## ANALYSIS

As with all claims of negligence, in order to make a prima facie case of medical malpractice under Mississippi law, plaintiff must establish the following elements: (1) The existence of a duty on the part of the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) A failure by the defendant to

6

conform to that standard; and (3) An injury to the plaintiff proximately caused by the breach of such duty by the defendant. *Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993) (citations omitted). It is a general rule under Mississippi law that plaintiffs in medical malpractice actions must use expert testimony to establish a physician's negligence, and that lay testimony can be used only to establish those things that a layperson can observe and understand as a matter of common sense and practical experience. *Id.* (*citing Kelley v. Frederic*, 573 So. 2d 1385, 1387, 1388 (Miss. 1990)); *Palmer v. Biloxi Regional Med. Ctr.*, 564 So. 2d 1346, 1355 (Miss. 1990); *Phillips v. Hull*, 516 So. 2d 488, 491 (Miss. 1987); *Walker v. Skiwski*, 529 So. 2d 184, 187 (Miss. 1988). The expert must articulate the requisite standard of care, identify the breach of that standard of care and establish that the breach proximately caused the plaintiff's injuries. *Palmer*, 564 So. 2d at 1355; *Hull*, 516 So. 2d at 491. Where a determination of negligence in a medical malpractice case requires an expert, and where plaintiff does not produce one qualified to establish negligence, no material facts remain to be decided and summary judgment is proper. *Sheffield v. Goodwin*, 740 So. 2d 854 (Miss. 1999); *Hull*, 516 So. 2d at 491. The alleged negligence at issue in this case - defendants' failure to adequately and properly assess plaintiff's diabetes and failure to timely discover and adequately treat her post-operative infection - is certainly out of the realm of common sense and practice experience, and therefore expert testimony is required.

With respect to the negligence theory based on improper diabetic management, Dr. DiLeo specifically concludes in his report that Ms. Powell was diabetic and was being actively treated for it (she was receiving 4 milligrams of Amaryl prior to surgery), which was not addressed appropriately in the immediate post-operative period because: 1) there was no "sliding scale"

7

established as part of Ms. Powell's post-operative care; 2) that there were no serial blood sugar determinations to assess and maintain diabetic control, 3) that the only reference to an ADA diet was once for full liquids and that thereafter it is unknown what calorie diet Ms. Powell received; and 4) that only after Ms. Powell's second surgery was there any surveillance of her blood sugars or insulin prescribed. Dr. DiLoe concludes in his report:

> I feel that Mrs. Powell's lack of diabetic management could have impacted the onset and worsening of her postoperative infection after her initial surgery, and that this omission in her postoperative care breached the standard care in management of such care. Since her further surgeries were a result of this initial infectious process, this breach of the standard of care is a consideration in all of her subsequent surgeries and sequelae.

At his deposition, Dr. DiLeo conceded that his assumption that Ms. Powell was "receiving Amaryl 4mg prior to surgery" was erroneous and that according to the record of her September hospitalization, she was apparently not an Amaryl at all. In addition, when confronted with portions of Ms. Powell's medical record demonstrating that serial blood sugar determinations were performed on Ms. Powell twice a day on October 2, 3, 4, 5, 6, 7 and 8, Dr. DiLeo conceded that his criticism regarding the lack of blood sugar determinations was simply wrong and that he would not make that same criticism again. Ultimately, Dr. DiLeo conceded that he no longer had an opinion as to whether Ms. Powell's diabetes was mismanaged post-operatively, and that based on the data regarding the serial blood sugar determinations, his criticism regarding diabetic management appeared to no longer have an application in this case. Thus, in the absence of any expert testimony to establish negligence, and with plaintiff failing to

meet its burden under Rule 56 to identify specific evidence in the record demonstrating that there is a material fact issue concerning the essential elements of this claim (indeed, in its response to defendants' motion, plaintiff has not responded at all on this issue), summary judgment for defendants on the theory of negligence relating to the management of plaintiff's diabetes is proper.

Turning to plaintiff's negligence theory regarding her post-operative infection, Dr. DiLeo opines in his report that Ms. Powell's post-operative infection was not adequately monitored or treated because: 1) WBC and differentials were not ordered daily or even every other day, where certain abnormalities were possibly indicating the need for more urgent administration of advanced antibiotic regimens; and 2) that the initial antibiotic regimen of Augmentin was administered orally in a patient with only marginal gastrointestinal function, possibly jeopardizing its absorption and efficacy. Dr. DiLeo concludes in his report: "Her infection situation was not adequately monitored with appropriate blood work surveillance or adequately treated with antibiotics in the initial stages of managing her febrile morbidity." At his deposition, Dr. DiLeo testified that his primary criticism was that IV antibiotic therapy should have been started on post-operative day 2 (October 4, 2002), rather than post-operative day 4 (October 6, 2002). In response to being asked when, in his opinion, Ms. Powell should have been switched to IV antibiotics, Dr. DiLeo testified: "I would say that once a high risk patient such as this where you knew there was a chance of bowel injury or bowel complications even to the point where you order a bowel prep, that once you've made the decision in a patient high risk such as this to commit to antibiotics at all, they should have gone straight to I.V. So I would say October 4, post-op day two." Dr. DiLeo then confirmed that his primary criticism was that IV antibiotics

should have been ordered as early as October 4.

Defendants' criticism of this theory of negligence is based on causation. Defendants argue that certain statements made by Dr. DiLeo during his deposition demonstrate that he could not establish to a reasonable degree of medical certainty or even a probability that had plaintiff received the IV antibiotic treatment in a timely manner, her subsequent course (including the additional surgeries) would have been materially altered.  On the issue of causation, Dr. DiLeo was asked: "Doctor, are you suggesting that the perforation in the small bowel would have been avoided through the administration of IV antibiotic therapy two days earlier than it actually commenced?"  In response, Dr. DiLeo answered:  "Possibly.  Yes I am."  He then confirmed that he could not say anything other than "possibly."  A little later, Dr. DiLeo was asked whether earlier administration of IV antibiotics "would have altered this lady's course", and he responded: "It may have.  There's no way of telling.  We'll never know because it wasn't done." Elsewhere, Dr. DiLeo testified: "I can't predict the future.  I know this, that infection is a progressive continuum and the sooner you aggressively treat it, the more likely you are to mitigate its severity."  Counsel for defendants repeatedly tried to get Dr. DiLoe to opine to a "reasonable medical probability" or "reasonable medical certainty" that the outcome would have been altered if antibiotics had been administered earlier.  In response to such questions, Dr. DiLeo testified that he "can't say for sure" and he could not say "with certainty" or "we'll never know because she was never given the chance."

It has been noted that because in medical malpractice cases "the plaintiff is rarely able to prove to an absolute certainty" what would have happened in the absence of the alleged negligence, the "approach to the requirement of causation in medical malpractice cases

10

necessarily differs from that employed in most other tort contexts." *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985) (citations omitted). Indeed, "[a] measure of speculation is inherent in any causation inquiry in a malpractice case." *Harris v. Shields*, 568 So. 2d 269, 273 (Miss. 1990). Nevertheless, in order for plaintiff to survive summary judgment, she "must make a showing that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough.'" *Dickey v. Baptist Mem'l Hosp.*, 146 F.3d 262, 267 (5th Cir. 1998) (*citing Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987)); *see also Harris*, 568 so. 2d at 273 ("we have insisted that proof of causation remain within the realm of the reasonably probable and condemn the merely speculatively possible.") (citations omitted). This means that plaintiff must prove that "in the absence of the alleged malpractice, a better result was probable, or more likely than not." *Drummond*, 627 So. 2d at 270 (*citing Ladner v. Campbell*, 515 So. 2d 882, 887 (Miss. 1987)). Plaintiff must prove that "the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the patient's condition." *Id.*

Construing the above evidence in the light most favorable to the plaintiff, and drawing all reasonable inferences in her favor, this court finds that there is sufficient evidence in the record to establish a genuine issue of material fact as to whether the defendants' alleged failure to timely identify and adequately treat plaintiff's post-operative infection constituted negligence. Therefore, summary judgment is denied on this particular theory of negligence.

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendants' motion for summary judgment [**# 28**] is granted in part and denied in part. Defendants' request for oral argument on their motion for summary judgment [# 30] is denied.

SO ORDERED and ADJUDGED on this, the 16th day of November, 2006.

        s/ *Keith Starrett*
        UNITED STATES DISTRICT JUDGE